IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

NICOLE A. P.[1]     )
          )
    Plaintiff,   )
          )
vs.         )  Case No. 18-cv-0001-CJP[2]
          )
COMMISSIONER OF SOCIAL  )
SECURITY,      )
          )
    Defendant.  )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Nicole A. P. (Plaintiff) seeks judicial review of the final agency decision denying her application for Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for SSI on October 9, 2014, alleging a disability onset date of July 15, 2011. (Tr. 151). Plaintiff's application was denied at the initial level, and again upon reconsideration. (Tr. 48-70). She requested an evidentiary hearing, which Administrative Law Judge ("ALJ") Raymond Souza conducted on September 13, 2016. (Tr. 34-47). ALJ Souza reached an unfavorable decision on November 28, 2016. (Tr. 18-29). The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final agency decision. (Tr. 1-3).

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect her privacy. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). See Doc. 20.

Plaintiff exhausted her administrative remedies and filed a timely Complaint in this Court. (Doc. 1).

## Applicable Legal Standards

To qualify for SSI or disability insurance benefits, a claimant must be disabled within the meaning of the applicable statutes.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245

F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . .. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential,

it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The ALJ's Decision

ALJ Souza found Plaintiff had not engaged in substantial gainful activity since September 23, 2014, the application date. She had severe impairments of degenerative disc disease and gastroesophageal reflux disease ("GERD"). None of her impairments or combination of impairments met or equaled a Listing. (Tr. 20). Plaintiff had the RFC to perform sedentary work, with several additional limitations. (Tr. 21). Plaintiff was unable to perform any past relevant work but other jobs existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 27-28). The ALJ ultimately determined Plaintiff was not disabled. (Tr. 29).

## The Evidentiary Record

The following summary is directed at Plaintiff's arguments.

### 1. Agency Forms

In her agency forms, Plaintiff alleged the following conditions limited her ability to work: narrow bones in her spine, hernia surgery, degenerative disc disease, bad knees, not liking public interaction, GERD, and sickness from the air quality. (Tr. 169). Plaintiff previously worked as a hair dresser and for a temporary agency. (Tr. 171). She stated her right side went numb when she sat for too long and she would lose the ability to use her right leg. She could hardly walk and had to drag her leg. She could walk for about five minutes before needing to rest for

ten minutes. She could not stand for long, either, because she would lose her balance. She had trouble bending, using stairs, and squatting. She could concentrate for twenty minutes. Plaintiff tossed and turned all night due to hip pain. She could not use her dominant hand to open things when she cooked. It was difficult for her to bend and she could not lift. Back pain made it difficult for her to drive long distances. On an average day, she got her children ready for school and tried to walk around periodically throughout the day. She cooked and cleaned for her children. Plaintiff was able to grocery shop. She enjoyed reading but bending her head pulled on her back, so she was limited in her ability to read for long periods. (Tr. 177-82).

### 2. *Evidentiary Hearing*

Plaintiff appeared at an evidentiary hearing on September 13, 2016, at which she was represented by counsel. Plaintiff's attorney stated he had reviewed the record and did not object to the evidence. ALJ Souza admitted the exhibits into evidence and asked, "Anything further?" to which counsel replied, "I don't believe so, Judge." (Tr. 37).

Plaintiff testified her impairments were related to her back, neck, knees, and arms. She also had GERD. Plaintiff experienced a "pins and needles" sensation in her arms and sometimes had no strength in them. Her hands bruised easily. Plaintiff received injections in her neck, which offered temporary relief. She had difficulty sleeping because her hips felt like they were going to "pop." (Tr. 38-42).

### 3. Medical Records

Plaintiff presented to Dr. Bradley on August 9, 2013 for low back pain and left knee pain. She received injections prior to her visit, which did not help much with back pain. The injections did resolve her radiculopathy. Her biggest complaint was of lateral knee pain. On exam, Plaintiff had some pain to palpation along the lateral joint line. Her range of motion was from 0 to 135 degrees with excellent stability to varus and valgus stress. She did not open up approximately 1-1/2 centimeters to varus stressing but a good end point was noted. She had normal anterior and posterior drawer. McMurray created some very mild lateral-sided joint line pain, as did reverse McMurray, but no mechanical symptomatology was noted. Plaintiff had 5/5 strength in her quads, hamstrings, ankles, plantar flexors, dorsiflexors and extensor hallucis longus. Her sensation was intact distally. Multiple radiographs of Plaintiff's bilateral knees showed very mild degenerative disease of the lateral compartment with some loss of joint space. No particular osteophytes or subchondral sclerosis were noted. Dr. Bradley noted Plaintiff had early degenerative disease in her knee, but not a significant amount. She had a slightly valgus knee. Dr. Bradley administered an intra-articular cortocsteroid injection in her left knee without complication. (Tr. 243).

Plaintiff presented to Dr. Miguel Granger on March 18, 2014 for a checkup and complained of knee, hip, and back pain. On exam, Plaintiff demonstrated low back and knee pain with range of motion. Dr. Granger assessed Plaintiff with

hypertensions, osteoarthritis, and GERD. He referred Plaintiff to Dr. Bradley for x-rays. (Tr. 246-47).

Plaintiff saw Dr. Bradley on May 27, 2014 and complained of pain in her low back that radiated down her left leg. She also experienced some numbness in the lateral aspect of her leg and foot. Throughout the previous two weeks, her low back pain increased and she had radiculopathy-type symptoms. She said she had very minimal pain relief from the Medrol Dosepak she recently received from the emergency room. She was stretching and exercising at home. An examination of her low back revealed no erythema, redness, or warmth. Her flexion was to 70 degrees, her extension was to 10 degrees on the lateral side, and bending was 10 degrees in each direction. The bilateral lower extremities showed she had some weakness in her quads, rated at 4+/5 compared to the contralateral right quad. Otherwise, she had 5/5 strength throughout the entire left lower extremity. Plaintiff reported some decreased sensation along the lateral aspect of her lower leg and foot. Her plantar sensation was completely intact. She had 1+ patellar tendon, Achilles' tendon reflexes bilaterally, normal Babinski reflexes bilaterally, and no sustained clonus bilaterally. Dr. Bradley opined Plaintiff had some degenerative disc disease in her back, in combination with some symptoms of radiculopathy. She failed nonoperative treatment, including activity modification, anti-inflammatories, home exercises programs, and Medrol Dosepak. Dr. Bradley recommended an MRI scan to look for disc herniation with foraminal stenosis or

compression of the nerve root. He referred Plaintiff to pain management and instructed her to follow up as needed. (Tr. 242).

Plaintiff followed up with Dr. Granger on July 29, 2014. He prescribed Plaintiff tramadol and norco for osteoarthritis pain and referred her to a pain clinic. (Tr. 248-49).

Plaintiff followed up with Dr. Bradley on July 25, 2014. She reported her back pain was getting worse. An MRI scan from June 4, 2014 showed some degenerative disc disease at L4-5, resulting in some mild to moderate bilateral lateral foraminal stenosis. A physical examination remained completely unchanged from her prior exam. There was some facet hypertrophy throughout the entire lumbar spine. Dr. Bradley provided Plaintiff with a prescription for pain management and prescribed her tizanidine and "a very small amount of narcotic medication to get her through." He noted that no follow-up was necessary. (Tr. 241).

Plaintiff saw Dr. Kristina Naseer at Dr. Granger's office on September 3, 2014 and complained of right low back pain and left-sided neck pain. She previously had injections for low back pain, which helped with the pain. Her pain was in her left upper shoulder blade and right leg. The pain was present for about two years with gradual onset in her back that travelled to her hips and down to her knee. Her average pain was 10/10. Plaintiff described it as burning, aching, severe, constant, and worsening. She described associated weakness and numbness as well. The pain worsened when Plaintiff rolled in bed, exercised, drove, sat, moved from sitting

to standing, laid down, with weather changes, walking, stress, and fatigue. Pain medication offered relief. On exam, Plaintiff was slow to go from sitting to standing. She ambulated with a normal gait. Plaintiff had difficulty with heel and toe standing secondary to balance. Her range of motion was good, overall. She had exacerbated pain with forward flexion. Strength, sensation, and reflexes were otherwise unremarkable. A straight leg raise test produced axial back pain. She had some localized tenderness present along her right scapula region with good range of motion, overall, of her upper extremities and with her cervical spine. Dr. Naseer assessed Plaintiff with lumbar degenerative disk disease and lumbar spondylosis. She administered a right sided lumbar epidural injection and ordered an MRI of Plaintiff's cervical spine. Plaintiff was to follow up for reevaluation in two weeks. (Tr. 265-66).

Plaintiff presented to Southern Illinois Healthcare Foundation on October 28, 2014 and demonstrated lower back pain on range of motion. (Tr. 252).

Plaintiff received bilateral L4 lumbar transforaminal epidural injections on September 22, 2014 and October 31, 2014. (Tr. 261, 263).

Plaintiff saw Dr. Naseer on November 17, 2014 and complained of mid and low back pain. She had undergone a total of three epidural injections with very little benefit. Her pain was primarily in her low back and traveled down towards her hips. She also reported upper back pain. Tramadol helped a little bit but not significantly. Her pain score during the visit was 7/10. Plaintiff ambulated with a normal gait. She demonstrated pain with extension, palpable tenderness across

her lumbar facets, and pain with facet loading. A straight leg raise test was negative. Strength, sensation, and reflexes were unremarkable. She had multiple areas of muscle spasms and muscle knots present across her cervical trapezius and paraspinous muscles bilaterally. Dr. Granger assessed Plaintiff with myofascial pain, lumbar facet arthropathy, and lumbar spondylosis. He suggested lumbar facet blocks and physical therapy and prescribed her Norco for pain to take as needed. (Tr. 259-60).

Plaintiff attended three physical therapy sessions from November 25, 2014 through December 15, 2014. At her last visit, Plaintiff reported neck pain that she rated at a 5/10 and low back pain she rated at an 8/10. She reported her back had been feeling a little better. (Tr. 270-72).

Plaintiff received bilateral L4-5 and L5-S1 lumbar intraarticular facet join injections on December 5, 2014 and December 18, 2014. (Tr. 255, 257).

On February 17, 2015 and March 4, 2015, Plaintiff underwent right L2, L3, L4, and L5 lumbar medial branch radiofrequency denervation. (Tr. 276-77, 278-79).

Plaintiff followed up with Dr. Naseer on March 19, 2015. She was doing well following the radiofrequency denervation. Her pain was at a 2/10 and she had minimal pain across the left scapular region. Otherwise, her pain was much improved. She had increased her activity and decreased her medication. She was currently taking Norco and amitriptyline. On exam, Plaintiff had good range of motion with very minimal tenderness present to palpation across her cervical

paraspinous muscles and across her lumbar facets. Dr. Naseer assessed Plaintiff with cervical myofascial pain and lumbar facet arthropathy. Dr. Naseer instructed Plaintiff to follow up as needed. She refilled Plaintiff's Norco "one more time" and started Plaintiff on Flexeril and topical cream. (Tr. 280).

Plaintiff followed up with Dr. Granger on May 14, 2015. On exam, she demonstrated low back pain with range of motion and decreased range of motion. Dr. Granger prescribed her hydrocodone for lumbar radiculopathy. (Tr. 305-07).

State agency consultant Dr. Adrian Feinerman examined Plaintiff on July 7, 2015. Plaintiff reported low back pain that was present for the previous five years and due to degenerative disc disease. The pain radiated to both lower extremities. She also had knee pain secondary to her back problems and pain in her left shoulder and upper extremity. Plaintiff said she could walk one block, stand for 10 minutes, and sit for 10 minutes. She was able to squat, bend, and perform fine and gross manipulations without difficulty. Plaintiff was taking gabapentin, cyclobenzaprine, amitriptyline, and hydrocodone. On exam, there was no anatomic abnormality of any extremity and no evidence of redness, warmth, thickening or effusion of any joint, and no limitation of motion of any joint. Her grip strength was strong and equal bilaterally. There was no anatomic deformity of the cervical, thoracic, or lumbar spine and no limitation of motion of any spinal segment. She ambulated to 50 feet normally without any assistive device. Plaintiff's muscle strength was normal throughout, she had no spasm or atrophy, and her fine and

gross manipulation were normal. Dr. Feinerman assessed Plaintiff with lumbar disc disease and hypertension. (Tr. 282-91).

Plaintiff presented to the emergency room on July 29, 2015 with complaints of neck pain on the right side that she rated at a 10/10. An x-ray of Plaintiff's pelvis was unremarkable. A CT of her cervical spine showed mild loss of the normal cervical lordosis. Plaintiff was diagnosed with cervical radiculopathy and prescribed Ultram and Baclofen. (Tr. 317-23).

Plaintiff presented to Dr. Granger on August 12, 2015. On exam she demonstrated low back and neck pain with range of motion. Dr. Granger prescribed Plaintiff hydrocodone for her lumbar radiculopathy. (Tr. 302-04).

Plaintiff saw Dr. Naseer on August 26, 2015 with complaints of neck and hip pain. She was diagnosed with myofascial pain and received cervical and lumbar trigger point injections. (Tr. 335).

An MRI of Plaintiff's cervical spine from October 9, 2015 demonstrated a tiny spinal cord syrinx at C6-C7, measuring six millimeters in length; minimal degenerative changes with physiologic annular bulging at C4-5 and C6-7; a small right perineural cyst at C6-7, measuring seven millimeters; and empty sella and borderline sellar enlargement, measuring 14 millimeters. (Tr. 337-38).

An MRI of Plaintiff's cervical spine from November 10, 2015 showed a stable small syrinx at C66-7 with no surrounding abnormal enhancement or causative mass lesion, which may have been a developmental variant, and a stable right

perineural nerve root sheath cyst at C6-7 with no abnormal enhancement that occupied approximately 50% of the diameter of the right foramen. (Tr. 339).

Plaintiff followed up with Dr. Granger on November 12, 2015. She demonstrated low back and neck pain with range of motion on exam. He prescribed hydrocodone and tramadol for osteoarthritis. (Tr. 298-300).

Plaintiff went to the emergency room on November 25, 2015 with complaints of right knee and back pain after slipping and falling on a loose rug the previous day. She demonstrated normal range of motion on exam. An x-ray of her right knee showed early medial compartment osteoarthritis but no fracture or joint effusion. An x-ray of her lumbosacral spine showed no fracture, subluxation, or bone destructive process. Her interspaces appeared within normal limits and her sacroiliac joints were normal. She was diagnosed with a right knee strain with lower back pain. Plaintiff was instructed to rest, ice, and elevate her knee, apply warm heat to her back, keep moving, and follow up with her primary care physician. (Tr. 341-49).

Plaintiff received a left C7-T1 cervical interlaminar epidural steroid injection on December 16, 2015. (Tr. 351).

Plaintiff saw Dr. Granger on January 21, 2016. She had a right knee abrasion and demonstrated pain with range of motion of the bilateral knees. Dr. Granger refilled Plaintiff's medications, including gabapentin for osteoarthritis, sertraline for anxiety, and hydrocodone and tramadol for lumbar radiculopathy. He also referred Plaintiff to a neurologist for her radiculopathy. (Tr. 294-97).

Plaintiff presented to Dr. Muddasani Reddy on February 22, 2016 with complaints of pain in her lower and upper back. The lower back pain had been present for five years and the upper back pain had been present for two years. She experienced some pain radiation down to the right arm. Her low back pain radiated down to the right leg. A spine x-ray revealed syrinx of six millimeter in length at the C6-C7 level. A lumbosacral spine x-ray showed degenerative disc disease centered on L4-L5, which resulted in bilateral lateral disc space narrowing effecting descending nerve roots and bilateral mild foraminal stenosis. There was no evidence of canal stenosis. There was bilateral facet arthropathy at L3-L4, L4-L5, and L5-S1 with bilateral facet effusions at L4-L5. There was no suspicious bone lesion and no cord signal abnormalities were identified. A straight leg raising test was around 70 degrees bilaterally. Dr. Reddy assessed Plaintiff with severe back pain, probably related to degenerative joint disease and neck pain with radiation to the right upper extremity. In light of the C6-C7 syrinx, Dr. Reddy recommended Plaintiff see a neurosurgeon. He instructed her to continue to treat with pain medication and seek continued follow up care with a pain clinic. (Tr. 308-11).

Plaintiff underwent a right L2, L3, L4, L5, and S1 lumbar medial branch radiofrequency denervation on March 8, 2016. (Tr. 354).

Plaintiff presented to the emergency room on March 26, 2016 with complaints of back pain, which had persisted for months. On exam, she demonstrated normal range of motion and 5/5 strength of the upper and lower bilateral extremities. She was nontender in the extremities. Her thoracic

paraspinous muscles were tender to palpation. She was diagnosed with chronic back pain and prescribed Flexeril and hydrocodone. (Tr. 398-401).

On April 19, 2016, Plaintiff underwent bilateral C6 and C7 cervical medial branch blocks. (Tr. 451).

Plaintiff saw Dr. Jeroen Coppens on May 31, 2016 for back pain. She was diagnosed chronic back pain and instructed to obtain an MRI and follow up with the results. (Tr. 374-75).

Plaintiff followed up with Dr. Granger on June 9, 2016. He prescribed hydrocodone and Voltaren for osteoarthritis and referred her to a neurologist for lumbar radiculopathy. On exam, she had low back pain with range of motion. (Tr. 415-18).

Plaintiff consulted neurologist Dr. Juan Carlos Escandon on July 29, 2016. On exam, she had a normal gait with a negative Romberg and Pull test. She had significant head forward posturing, four fingers on both sides. She had multiple areas of muscle tenderness to deep palpation, including in the suboccipital region, cervical, paraspinals, and trapezius, in the upper thoracic para spinal with exquisite tenderness, in the arms just below shoulder and below the elbows in the dorsal aspect, and in the distal phalanx of the fingers. Dr. Escandon wrote that Plaintiff suffered from pain and parasthesias in multiple areas of her body that did not represent a particular dermatomal distribution or peripheral neuropathy. There were no objective abnormalities on her neurological exam. The abnormalities were on the musculoskeletal exam. In addition to the head forward

syndrome, which may have explained the pain in her left scapular region, she had multiple tender points. On a review of symptoms, she enforced intermittent local swelling in the right foot as well as fatigue and active anxiety. Dr. Escandon opined that Plaintiff's problems were more in the rheumatological area. He was "particularly suspicious of fibromyalgia. . ." Dr. Escandon recommended Plaintiff obtain a rheumatological evaluation, participate in physical therapy for the head forward syndrome, and continue pain management. Dr. Escandon wrote to Dr. Granger that Plaintiff was "clearly in distress" and her complaints were "real." (Tr. 383-87).

Plaintiff presented to Dr. Michael Prim on July 26, 2016 with complaints of intermittent hand weakness and numbness, as well as a burning sensation in her thigh and left foot. Dr. Prim assessed Plaintiff with mild degenerative disc disease and peripheral neuropathy. He reviewed an MRI of Plaintiff's lumbar spine and noted it was "without significant pathology that explains patients symptoms." Dr. Prim referred Plaintiff to a neurologist. Dr. Coppens reviewed Dr. Prim's assessment and added that Plaintiff would not benefit from surgery. (Tr. 390-93).

Plaintiff underwent a left C5, C6, and C7 cervical medial branch radiofrequency denervation on August 17, 2016. (Tr. 446).

Plaintiff saw Dr. Granger on August 22, 2016 for a follow up. He prescribed Plaintiff hydrocodone and ranitidine for osteoarthritis and referred her to a rheumatologist. He also prescribed Plaintiff baclofen and tramadol for lumbar radiculopathy and referred her to a neurologist. (Tr. 412-14).

### 4.  State-Agency Consultant RFC Assessments

State-agency consultant Dr. Julio Pardo conducted an RFC assessment of Plaintiff on January 26, 2015.  He opined Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a a total of six hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; and was limited n her ability to push and/or pull with the bilateral upper extremities.  Plaintiff could occasionally climb ladders, ropes, and scaffolds; climb ramps/stairs; kneel; stoop; crawl; and crouch.  She could frequently balance.  Plaintiff was limited in her ability to reach overhead with both arms.  Plaintiff should avoid concentrated exposure to extreme cold and heat, vibration, and hazards.  (Tr. 53-55).

Dr. David Mack conducted an RFC assessment of Plaintiff on July 24, 2015 and concurred with Dr. Pardo's opinion.  (Tr. 66-68).

### Analysis

Plaintiff argues the ALJ erroneously omitted and mischaracterized medical evidence that is crucial to the disability determination.

An ALJ has a duty to evaluate the record fairly.  *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).  Although an ALJ need not mention every piece of evidence in the record, he must articulate a "logical bridge" between the evidence and his conclusions and cannot ignore an entire line of evidence contrary to his ruling.  *Terry v. Astrue*, 580 F.3d 471, 475-77 (7th Cir. 2009).  On review, the Court does not "nitpick the ALJ's opinion for inconsistencies or contradictions,"

but rather, "give[s] it a commonsensical reading." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

Plaintiff first takes issue with the ALJ's deference to a medical record from July 26, 2016. On that date, Plaintiff saw Dr. Prim, who reviewed an MRI of Plaintiff's lumbar spine and opined that it did not demonstrate a "significant pathology" that explained Plaintiff's symptoms. (Tr. 392). The ALJ highlighted this in his decision, noting, "The opinion that the lumbar spine MRI is without significant pathology that explains the claimant's symptoms is given considerable deference in finding that the claimant is limited as stated above but does not have disabling symptoms and limitations." (Tr. 25). Plaintiff contests this line of the ALJ's reasoning because the ALJ allegedly failed to recognize contrary evidence. Namely, Plaintiff points to a letter from Dr. Escandon to Dr. Granger following a neurological examination. The letter reads, "Includ[ed] are recommendations that I hope you implement [as] she clearly is in distress. . . I do feel her complaint[s] are real." (Tr. 383). According to Plaintiff, "The ALJ failed or refused to recognize that Dr. Escandon believed Plaintiff's reports of pain and limitations, irrespective of the cause." (Doc. 16, p. 4).

Despite Plaintiff's contentions, the ALJ did acknowledge that Dr. Escandon validated Plaintiff's complaints of pain. The ALJ wrote, "Based on exam findings, [Dr. Escandon] concluded that the claimant suffers from pain . . . " (Tr. 25). The ALJ did not did commit an error in this part of his decision.

Plaintiff also argues the ALJ failed to accurately summarize Plaintiff's visit to the emergency room on March 26, 2016.  The ALJ stated,

> The claimant presented to the emergency department (ER) on March 26, 2016 for complaints of chronic back pain and being out of her Hydrocodone . . . Exam showed normal range of motion in all extremities, 5/5 strength in the upper and lower extremities bilaterally, normal pulses.

(Tr. 24).

According to Plaintiff, she "actually presented to the ER secondary to a panic attack brought on by severe pain." (Doc. 16, p. 5).  She argues the ALJ committed error by not recognizing this detail.

Plaintiff's argument is unconvincing because the medical record does not state that severe pain induced Plaintiff's panic attack.  Instead, the document reads,

> 39-year-old female presents with back pain. Patient has a history of chronic back pain.  States she has been dealing with this pain for months.  States that earlier today she became very overwhelmed couldn't breathe her heart was racing and she became nauseous.  Her family called an ambulance states she has never had a panic attack before now currently denying shortness of breath, chest pain, fever, headache, feelings of anxiety.

(Tr. 398).

Plaintiff cannot fault the ALJ for failing to draw an inference from the medical record to determine the source of a panic attack.  In fact, ALJs may not "draw medical conclusions themselves about a claimant without relying on medical evidence." *Back v. Barnhart*, 63 F. App'x 254, 259 (7th Cir. 2003).  The ALJ did not erroneously interpret Plaintiff's emergency room visit from March 2016.

Plaintiff seems to generally critique the ALJ's evaluation of her complaints of pain. Social Security Ruling 96-7p provides that an ALJ should consider the following factors when evaluating subjective complaints: the claimant's daily activities; the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment, other than medication; and other measures used to relieve pain. The ALJ, here, complied with this Ruling. ALJ Souza mentioned Plaintiff's testimony about the limiting effects of her pain. The ALJ noted Plaintiff could not use her hands when she had pain and had to rest for 20 minutes after performing only five to 10 minutes of activity. (Tr. 22). The ALJ also noted Plaintiff's claims that she could only walk one block, stand for ten minutes, and sit for ten minutes. (Tr. 26). The ALJ also identified the location of Plaintiff's pain as her back, arms, and hips. (*Id.*). Additionally, the ALJ pointed out Plaintiff's use of pain medications, stating Plaintiff was prescribed Tramadol, Hydrocodone, Flexeril, and "narcotic pain medication." (Tr. 24). The ALJ indicated that activity exacerbated Plaintiff's pain, and that medication and injections offered temporary relief. (Tr. 22). Finally, the ALJ acknowledged other treatments Plaintiff utilized to alleviate her pain, including injections and nerve ablation. (Tr. 22-25).

In sum, Plaintiff has failed to demonstrate that the ALJ cherry-picked from the record or omitted a line of evidence contrary to the disability determination. The ALJ's analysis of the record related to Plaintiff's complaints of pain was not erroneous.

Plaintiff also criticizes the ALJ for ignoring objective medical evidence that supported Plaintiff's subjective complaints. Specifically, the ALJ mentioned Dr. Naseer's observation that Plaintiff "was able to go from a sitting to standing position." (Tr. 23). Plaintiff criticizes the ALJ for not acknowledging that Dr. Nasser noted Plaintiff was *slow* to go from a sitting to standing position. Plaintiff does not explain how this "error" is relevant to the disability determination or how it altered the ALJ's logic. (Tr. 21). Again, the Court does not nitpick the ALJ's decision on review. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

Plaintiff also asserts the ALJ's decision was erroneous because "although the ALJ recognized that Dr. Escandon confirmed significant head forward posturing, the ALJ failed to consider the remainder of Dr. Escandon's sentence, which confirms that the head forward syndrome, 'may help to explain the pain in the left scapular region.'" (Doc. 16, p. 4) (internal citations omitted). But the ALJ did recognize this portion of Dr. Escandon's record. ALJ Souza wrote, "In addition to the head forward posturing syndrome *that may help to explain the pain in the left scapular region*. . ." (Tr. 25). There was no error here.

Additionally, the Plaintiff says the ALJ failed to cite to Dr. Granger's note from March 8, 2016, in which "it appears that Dr. Granger observed tenderness to palpation (TTP) in the extremities." (Doc. 16, p. 5). Plaintiff argues that "it appears" that Dr. Granger made this finding because the record she cites to in her argument is a largely illegible handwritten record. (Tr. 455). Even if the ALJ did fail to identify a TTP finding, it was not reversible error. The ALJ noted elsewhere in his

opinion that Plaintiff demonstrated TTP of the extremities on exam, (Tr. 24-25), and, therefore, he did not ignore an entire line of evidence contrary to his ruling.

Plaintiff also asserts the ALJ erroneously opined that Plaintiff demonstrated "only somewhat decreased" range of motion of the lumbar spine at a doctor's appointment on May 27, 2014. On that day, Plaintiff's flexion was to 70 degrees, her extension was to 10 degrees on the lateral side, and bending was 10 degrees in each direction. (Tr. 242). Plaintiff maintains the reduction in the range of motion of the lumbar spine was "significant" because extension and lateral side bending were to 10 degrees out of 30 degrees, which is a 66% reduction in the ability to extend the spine and side-bend. (Doc. 16, pp. 4-5).

Plaintiff has not explained how this error altered the ALJ's determination. The ALJ, through the vocational expert, identified jobs Plaintiff could perform that do not require any stooping or crouching.[4] (Cosmetologist, DOT #332.271-010; Assembler, DOT #700.684-014). Thus, any error in the ALJ's description of Plaintiff's range of motion from May 2014 and her ability to bend would not alter the disability determination.

In sum, Plaintiff has failed to show the ALJ committed reversible error in evaluating the medical record. Although there were portions of the record that corroborated Plaintiff's complaints of pain, the ALJ acknowledged them and weighed the evidence as he saw fit. Unless Plaintiff can show the ALJ's decision was illogical or based on an unfair or incomplete review of the record, the Court

---

[4] Social Security Ruling 83-10 uses "stooping" and "crouching" to describe different types of bending.

must uphold the disability determination. Plaintiff has not met this burden and the Court cannot reweigh the evidence. *Terry v. Astrue*, 580 F.3d 471, 476 (7th Cir. 2009).

Plaintiff also argues the ALJ erred at Step 2 of the disability determination. "The Step 2 determination is a *de minimis* screening for groundless claims. . . ." *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) (internal quotations and citations omitted). "As long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process. . . ." *Castile v. Astrue*, 617 F.3d 923, 926-27 (7th Cir. 2010) (internal quotations and citations omitted). In sum, if the ALJ finds at least one severe impairment, continues on with the analysis, and considers the combined effect of all impairments, any error at Step 2 is harmless. *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012).

Here, the ALJ found Plaintiff had severe impairments of degenerative disc disease and GERD. (Tr. 20). Plaintiff argues the ALJ's decision must be reversed and remanded because the ALJ did not specify whether Plaintiff had degenerative disk disease in the cervical spine, the lumbar spine, or both, and failed to consider the combined effects of those impairments. As already stated, any error in designating an impairment as severe is harmless as long as the ALJ continues to Step 3. Thus, the only issue here is whether the ALJ considered the combined effects of Plaintiff's impairments, both severe and non-severe.

Plaintiff regurgitates medical records documenting treatment of her cervical spine and lumbar spine and asserts the ALJ failed to support the RFC. However, Plaintiff does not point out any evidence the ALJ did not address. ALJ Souza thoroughly documented Plaintiff's issues with her lumbar and cervical spine. He included in his discussion of the evidence the MRIs showing degenerative disc disease of the cervical spine and lumbar spine, Plaintiff's subjective complaints, and the treatments Plaintiff underwent for those issues, such as injections. The ALJ's decision demonstrated that he considered the combined effects of Plaintiff's impairments when crafting the RFC. Moreover, ALJ Souza relied on RFC assessments from state-agency consultants to craft the RFC. Plaintiff has not proffered any contrary evidence suggesting she had a more restrictive RFC. The ALJ's finding, to this end, was not erroneous.

Finally, Plaintiff contends the ALJ did not fully and fairly develop the record related to her arm pain. "[T]he ALJ in a Social Security hearing has a duty to develop a full and fair record." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). The Seventh Circuit has considered a number of factors to determine whether the record is "full and fair:"

> (1) whether the ALJ obtained all of the claimant's medical and treatment records; (2) whether the ALJ elicited detailed testimony from the claimant at the hearing (probing into relevant areas, including medical evidence on the record, medications, pain, daily activities, the nature of all physical and mental limitations, etc.); and (3) whether the ALJ heard testimony from examining or treating physicians.

*Ferguson v. Barnhart*, 67 F. App'x 360, 367 (7th Cir. 2003). When a claimant is represented by counsel, the ALJ is "entitled to assume" that she is making her

"strongest case for benefits." *Wilkins v. Barnhart*, 69 F. App'x 775, 781 (7th Cir. 2003) (internal quotations and citations omitted).

Here, ALJ Souza asked Plaintiff's counsel whether he reviewed the record. Counsel stated he had no objection to the evidence and there was nothing further to submit. (Tr. 37). Additionally, Plaintiff testified she had issues with her arms and the ALJ continued to probe her for more information:

Q: Okay. What happened to your arms?

A: They have the sensation of pins and needles and sometimes they just – strength just leaves them. Like the other day when – you probably see it, a slight – my knuckle bruised. . .

(Tr. 38).

The ALJ met his duty to develop a full and fair record by questioning Plaintiff about her arm and hand issues and ensuring the record was complete. Nonetheless, Plaintiff does not contend there is any additional evidence that would warrant a more restrictive RFC. "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). Plaintiff's conclusory allegation that the ALJ failed to develop the record is not enough for remand.

The bulk of Plaintiff's arguments disputes the ALJ's interpretation of the evidence. Without more, the Court must affirm the ALJ's decision, as it cannot reweigh evidence or substitute its own judgment for that of the ALJ's. *Terry v.*

*Astrue*, 580 F.3d 471, 476 (7th Cir. 2009).  Substantial evidence supports the ALJ's disability determination.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **AFFIRMED.**

The Clerk of Court is directed to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**DATE:  November 2, 2018.**


**<u>s/ Clifford J. Proud</u>**
**CLIFFORD J. PROUD**
**U.S. MAGISTRATE JUDGE**